IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| MONICA McMICHAEL obo M.M., | ) | |
| | ) | CASE NO. 1:15-CV-1135 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | JUDGE JAMES GWIN |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | KENNETH S. McHARGH |
| SECURITY ADMINISTRATION, | ) | |
| | ) | REPORT & RECOMMENDATION |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Monica McMichael's ("Plaintiff" or "Ms. McMichael") application, on behalf of her minor child ("M.M." or "claimant") for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq* is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be VACATED, and the case be REMANDED back to the Social Security Administration.

## I.  PROCEDURAL HISTORY

Plaintiff Monica McMichael, on behalf of her minor daughter, M.M., applied for Supplemental Security Income benefits on August 16, 2011, alleging disability due to ADHD,

with an onset date of August 15, 2011.  (Tr. 132). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration.  (Tr. 132-41, 143-52).

Plaintiff requested that an administrative law judge convene a hearing to evaluate her applications.  (Tr. 166).  On December 10, 2013, an administrative hearing was held before Administrative Law Judge Frederick Andreas ("ALJ"). (Tr. 86-119). Both M.M. and Plaintiff appeared, represented by attorney Bradley Davis, and Plaintiff testified before the ALJ.  (*Id.*). On January 31, 2014, the ALJ issued a decision finding M.M. was not disabled.  (Tr. 67-81). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council.  (Tr. 59-63).  The Appeals Council denied her request for review, making the ALJ's January 1, 2014, determination the final decision of the Commissioner. (Tr. 1-4).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. § 1383(c).

## II.  EVIDENCE

A.  Personal Background Information

M.M. was born on March 24, 2006, making her a "preschooler" on the date of the application and a "school-age" child on the date of the ALJ's decision, under 20. C.F.R. 416.926a(g)(2).  (Tr. 206).  At the time of the hearing, M.M. was 7-years-old and in the second grade.  (Tr. 95, 101).

B.  Educational and Medical Evidence[1]

On June 17, 2011, M.M. began counseling at Bellefaire Jewish Children's Bureau, on referral from her mother and teacher, due to arguing with peers and others, disruptive behaviors, hyperactive behaviors, and poor school success.  (Tr. 333).  Stephanie Schleifer, LPCC-S/LSW conducted a mental status examination on June 17, 2011 and June 21, 2011.  (Tr. 309-21).  Her

---

[1] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

clinical summary stated M.M. was referred for behavioral issues at home and at school, noting she argued with peers and adults, did not follow rules and struggled to remain in designated areas in school, had tantrums and excessive energy, and would leave the classroom or home without adult supervision or permission.

The check-box questionnaire indicated that M.M. showed unremarkable findings in the following categories:   Appearance, Thought Content, Behavior, Speech, Perceptions, Affect/Mood, Suicidality, and Homicidality.  (Tr. 309-10).   Intellectual Functioning showed M.M. was hyper-responsive to stimuli in that she was distracted by environmental noises and sights during her assessment; and her Thought Processes included "magical thinking" but was noted as age appropriate.  (*Id.*).  Under General Functioning, M.M. was reported as showing decreased impulse control and a reduced ability to provide for her own basic needs or safety, and included commentary that she walks out of her classroom and home without permission, and additional comments included under "other careless or unsafe behavior" stating she walked out of her home "in a manner unsafe for her age." (*Id.*).  Additionally, Ms. Schleifer noted M.M.'s school performance was below her norm or potential, commenting that she will not work for her teacher, leading to academic performance below where it should be for her age.  (Tr. 310).

Ms. Schleifer's report showed severe conflict and occasional positive activities with caregivers, but moderate conflict and frequent positive activities with siblings.  (Tr. 311).  Under Social and Peer Group Functioning, the assessment indicated M.M. had difficulty sustaining friendships, and was aggressive and controlling with peers, with whom M.M. had frequent conflicts leading to isolation and rejection.   (Tr. 312-13).   It was also noted that M.M. participated in church activities, and her family attended religious services on a consistent basis. (Tr. 312, 314).   M.M. was assessed with below average intelligence, but with cognitive

functioning appropriate to her age and development, and, under Behavioral Functioning, was aggressive, oppositional, hyperactive, impulsive, easily distracted, and moody/unpredictable. (Tr. 314).  At this assessment M.M. was shown as enrolled in Kindergarten with good attendance and, despite being motivated and ready to learn, had behavior and performance concerns.  (Tr. 315).  As of the date of the assessment, M.M. had not been suspended or otherwise removed from school.  (*Id.*).

Ms. Schleifer diagnosed M.M. with Attention Deficit Hyperactivity Disorder, combined type, and assigned a GAF score of 53, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning.  (Tr. 318-19).  The clinical summary showed M.M. struggled to remain attentive and on-task during the assessment, and that she climbed on the table and chairs.  (Tr. 319).  M.M. had a history of struggling to sustain attention in academic and play activities, is forgetful and becomes easily distracted, and does not follow through on instructions or listen when spoken to.  (Tr. 319-20).  It was reported that M.M.  demonstrated excessively impulsive behaviors since she was 2-years-old, and "often acts as if she is driven by a motor," struggling to remain seated, talking excessively, fidgeting and squirming, and running rather than walking.  (Tr. 320).  Under Strengths and Capabilities, Ms. Schleifer documented that M.M. has a positive relationship with her parents and siblings, is learning skills that will be useful in the future, keeps neat and clean, has a desire to please adults, and responds well to a positive reinforcement-based program.  (Tr. 319).  M.M. was recommended for outpatient, individual therapy as well as CPST services.  (Tr. 320).

An Individualized Service Plan (ISP) was created for M.M. in July of 2011.  (Tr. 323, 325-31).  At that time, the goals addressed by the ISP were (1) for M.M. to express feelings and thoughts appropriately and reduce aggressive episodes, and (2) for M.M. to increase coping

skills, enabling her to decrease hyperactivity, impulsivity and inattention, while developing age-appropriate social skills. (Tr. 323). The ISP identified strengths M.M. possessed that could help her achieve these goals, specifically: (1) that M.M. feels good about herself, participates in hobbies and recreational activities, keeps neat and clean, and is learning skills that will be useful for the future; and (2) M.M. has a desire to engage in peer activities, and has good self-care skills for her age. (Tr. 326, 328).

M.M. participated in individualized therapy on July 14, 2011, and, although she showed improvement by demonstrating an ability to function with redirection and some limit setting, notes showed M.M. attempted to manipulate the therapist, required frequent redirection, and struggled with limit setting. (Tr. 324). On July 28, 2011, M.M. again participated in therapy and showed improvement; Ms. Schleifer documented that she frequently attempted to test limits, but was responding well to redirection. (Tr. 323). At a following session on August 10, 2011, M.M. struggled to following directions, had issues with boundaries, required frequent intervention and redirection, with which she did not do well, and was noted as attempting to manipulate the therapist. (Tr. 322). At this time there was "no change" in M.M.'s progress. (*Id.*).

On August 12, 2011, Ms. Schleifer provided a written summary of her clinical observations and diagnosis of M.M., as documented in the mental assessment and treatment notes. (Tr. 333). The summary included her opinion that M.M. should be evaluated for medication management. (*Id.*).

At a medical exam well-visit on August 15, 2011, examination notes showed M.M. at that time exhibited normal mood and affect. (Tr. 339). Notes documented that Ms. McMichael discussed with the doctor M.M.'s behavioral issues, including dealing with negativism, stealing and lying, and school behavioral problems. (Tr. 340).

M.M.'s ISP was reviewed and modified on November 2, 2011. (Tr. 355-62). While the stated rationale for treatment, originally stated goals, and identified strengths all remained the same, some specific therapy objectives were modified and a third treatment goal was added. (Tr. 355-62). The new goal was to address M.M.'s presenting problem of poor interpersonal skills, impulsivity and lying, and that she has difficulty identifying and expressing her emotions. (Tr. 360). The adjusted ISP therefore added a goal to increase M.M.'s ability to control her behaviors at school and home, as reported by significant others and herself. (*Id.*).

Ms. Scheifer provided a letter dated April 4, 2012, summarizing M.M.'s counseling for her diagnosed ADHD, dating back to June 17, 2011. (Tr. 350). The document stated that M.M. continued to have difficulty remaining attentive and on task, and Ms. Scheifer noted M.M. still responded often and quickly to external stimuli in the room. (*Id.*). Her problem behaviors manifested both in the home and school environments, and she appears to not listen, fails to follow through on instructions or give close attention to work (despite her teacher reporting she is academically proficient), loses things necessary for work, fidgets and squirms in her seat, and talks excessively. (*Id*). Ms. Scheifer also indicated M.M. continued to struggle with social interactions, "often alienating peers due to her dominant nature," and acting disrespectful and defiant towards adults. (*Id.*). Treatment was ongoing to address these behaviors, specifically targeting her aggressive, hyperactive, and impulsive behaviors, along with her failure to maintain attention and to develop age-appropriate social skills. (*Id.*). Ms. Scheifer's therapy was further designed to help M.M. increase her ability to control her behaviors at school and home. (*Id.*).

On April 17, 2013, M.M.'s ISP was reviewed and continued, with the addition of a fourth treatment goal. (Tr. 279-88, 371-80). The goal of M.M. increasing socially acceptable behaviors, as seen by an increase in the frequency of positive interactions, was added to the

original, continued goals.  (Tr. 378).  The ISP indicated this goal was added to address M.M.'s inability to have appropriate interactions with peers, family and other adults, and her constant lying and failure to accept responsibility for her actions.  (*Id.*).  The ISP noted that M.M. had been referred to an After School Partial Hospitalization Program to address these behaviors, and that she exhibited the following strengths related to this additional goal:  "[M.M.] enjoys positive interactions with adults…[and] desires closer relationships with peers."  (*Id.*).  The ISP also reflected a continuation of the strengths M.M. exhibited previously that related to goal number three of increasing her ability to control her behaviors, including getting along with her family, attending school and getting passing grades, and learning skills that will be useful in future jobs.  (Tr. 376).

On April 19, 2013, M.M.'s Mental Health Assessment was updated, and clinical notes indicated she continued to struggle with oppositional behaviors, some of which had escalated both at home and at school.  (Tr. 381).  Specifically, it was noted that while M.M. had begun to respond better to directives from adults and had fewer aggressive episodes, she had some regression, and had now "begun to argue with teachers or actively defy their requests, deliberately annoy others, has few friends and will not accept responsibility for her actions." (*Id.*).  Further, the assessment stated she was referred to the Partial Hospitalization Program "to address her growing needs in a more restrictive environment," and that her parent had requested a pharmacological assessment.  (*Id.*).  Relating to her therapy, the report indicated that, while she had shown expected progress in group therapy, she had made only minimal progress in her individual behavioral health counseling.  (*Id.*).  At this time M.M. was assessed with a GAF score of 51, noting her highest GAF in the past year was 55, and documented the following on-going treatment needs:  (1) education, skills, and support to manage symptoms and develop skills

to function in the community; (2) development and/or improvement of safety skills, emotional management skills, skills to interact appropriately in the community, problem solving skills, interpersonal effectiveness skills, coping skills; self-awareness, and awareness of consequences of behavior and/or choices; and (3) medication management.  (Tr. 382).

Jonathan Nehrer, M.D.

On July 9, 2013, M.M. saw psychiatrist Jonathan Nehrer, M.D.  (Tr. 367-70).  Dr. Nehrer's examination notes indicated M.M. actively displays a pattern of disobedience, defiance to authority and peer struggles, that she yells and argues, loses friends, and is hyper and disruptive.  (Tr. 367).  Per her mother, Dr. Nehrer noted M.M. has 7 of 8 symptoms of ODD, and 8 of 9 symptoms of both parts of ADHD, has poor sleep, and recently developed night time bed wetting.  (*Id.*).  Her mental status exam showed she had a decreased frustration tolerance and was disinhibited, with otherwise unremarkable results.  (Tr. 368-69).  Dr. Nehrer started M.M. on a trial of Adderall extended release 5mg for her ADHD, noting her older brother was doing well on a higher dosage of that medication.  (Tr. 369).  At this time Dr. Nehrer assigned a GAF score of 45.  (*Id.*).

M.M. had a follow-up visit with Dr. Nehrer on September 3, 2013, at which time M.M.'s mother reported continuing sleep disruption.  (Tr. 364).  Mental status exam results were unremarkable.  (Tr. 364-65).  Dr. Nehrer increased M.M.'s dosage of Adderall, and prescribed behavioral intervention for her "sleep phase problem."  (Tr. 365).  At this time Dr. Nehrer opined that there had been no change in her behavior.  (Tr. 366).

M.M. again saw Dr. Nehrer on October 29, 2013.  (Tr. 415).  Notes indicated Ms. McMichael informed Dr. Nehrer that the Adderall was working but that she continued to be disruptive at school (although was earning As and Bs and finishing school work early); however,

they wanted to wait on a dose increase due to a decrease in M.M.'s appetite.  (*Id.*).  Mental status

exam showed M.M. was exhibiting rumination/obsessing and a decreased frustration tolerance,

with otherwise unremarkable findings.  (Tr. 415-16).  M.M. was listed as showing improvement

on Adderall, and her dose was not increased.  (Tr. 416-17).

State Agency Consultants

1.  Dr. Koricke - Examining

On February 27, 2012, M.M. underwent a one-time consultative examination with

Deborah Koricke, Ph.D., on behalf of the agency.  (Tr. 342).  Dr. Koricke performed a child-

parent clinical interview, and noted Ms. McMichael told her she applied for disability for her

daughter due to her struggles with ADHD and behavior problems, which she believed prevented

M.M. from acting in an age-appropriate manner.  (*Id.*).  Her mother reported that M.M. was

enrolled in Kindergarten and receiving special education instruction, had an IEP in place, and

was suspended once the previous year for hitting and slapping another student.  (Tr. 343).  At the

time of the clinical interview, M.M. had never been treated with ADHD stimulant medication

such as Ritalin.  (*Id.*).  Ms. McMichael's report regarding M.M.'s history and behavioral

problems restated much of what was included in her previous mental assessment, including

aggressive and defiant behavior, tantrums, and refusal to follow directions, and additionally

stated M.M. will pull her own hair, curse, and destroy property.  (*Id.*).  She further reported M.M.

sometimes will take up to a half hour to fall asleep, and can take care of her personal hygiene and

dressing with reminders and assistance.  (Tr. 344).

In conducting her mental status examination, Dr. Koricke observed M.M. sleeping in the

waiting room, and, upon being awakened for the exam, was very tired and difficult to engage.

Dr. Koricke found M.M. was not motivated to interact and required a great deal of

encouragement, and was not happy about the examination requirements, making only intermittent eye contact.  (Tr. 344).  Consistent with earlier reports, Ms. McMichael informed Dr. Koricke that M.M. acts out impulsively, is oppositional and aggressive, becomes defiant when asked to clean her room, and has no friends due to fighting, but that she understands consequences and is responsive to discipline.  (Tr. 345).  Further, Dr. Koricke noted M.M.'s level of insight and judgment into her situation is limited for age, due to her impulsivity associated with ADHD/ODD.  (*Id.*).  Dr. Koricke diagnosed M.M. with ADHD, Combined Type and Oppositional Defiant Disorder, and assigned a GAF of 55, indicating moderate symptoms and moderate impairments in daily functioning.  (Tr. 345-46).  Dr. Koricke estimated her intelligence in the average range, but could not comment on academic levels.  (Tr. 346).

Dr. Koricke assessed M.M.'s functional abilities in the four relevant areas relating to her Social Security claim.  (Tr. 346-47).  In the domain of "acquiring and using information," Dr. Koricke opined that M.M. "likely has difficulty learning and retaining new information and in a group situation due to her ADHD and ODD symptoms," in that she is distracted by her surroundings and unmotivated and oppositional.  (Tr. 346).  In the domain of "attending to and completing tasks," Dr. Koricke determined M.M. will have difficulty sustaining attention for prolonged periods of time and will require redirection from adults in a group setting to complete assigned tasks.  (*Id.*).  Additionally, she opined M.M. can be disruptive due to her hyperactivity (requiring a higher level of supervision to complete tasks due to her poor sustained attention and impulsive behavior), and is likely to interrupt peers in a group situation.  (Tr. 346-47).  In the domain of "interacting and relating with others," Dr. Koricke referred to M.M.'s mother's statements that she does not have friends because she fights with them and is disrespectful towards adults, and found M.M. struggles to get along with others due to tantrums, aggression,

10

and oppositional/defiant behaviors.  (*Id.*).  Dr. Koricke further referred to her observations that M.M. put forth minimal effort and was very opposition and annoyed during her examination, with intermittent eye contact.  (*Id.*).  Finally, in the domain  of "self-care," Dr. Koricke expressed that, while M.M. is capable of self-care with structures and reminders, she frequently refuses to do so, and shows a poor frustration tolerance.  (*Id.*).  Dr. Koricke found M.M. had no difficulty asking for help when needed and is responsive to redirection and discipline, but has explosive outbursts and emotional extremes associated with temper tantrums, as well as difficulty settling down to sleep.  (*Id.*).

    2.  Cynthia Waggoner, Psy.D. - Reviewing

On March 5, 2012, Cynthia Waggoner, Psy.D., a state agency non-examining consultant, reviewed M.M.'s record.  (Tr. 137-41).  Dr. Waggoner stated she generally accepted the opinions of Dr. Koricke, and found Ms. McMichael's statements regarding M.M.'s daily temper tantrums, fighting, and throwing things were partially supported by the medical evidence and functional statements.  (Tr. 139).  Dr. Waggoner diagnosed M.M. with ADHD and Oppositional Defiant Disorder, but found she did not functionally equal a listed impairment.  (Tr. 137-39).  Assessing M.M.'s abilities in the relevant domains, Dr. Waggoner concluded she had no limitation in the domains of "moving about and manipulation of objects," "health and physical well-being," and "acquiring and using information" based on a lack of evidence from the school to support Ms. McMichael's statement that M.M. receives special education, and Dr. Koricke's estimation that M.M. had average intelligence.  (Tr. 138).  Further, Dr. Waggoner found M.M. had less than marked limitations in the domains of "attending and completing tasks" (based on a history of ADHD but that she is not taking any medication); "interacting and relating with others" (based on aggression toward others, defiant behavior toward her mother, and that she has no friends);

and "caring for herself" (noting M.M. needs redirection and reminders to do self-care and chores). (*Id.*). Overall, Dr. Waggoner summarized that "while [M.M.] has some problems with completing tasks and relating to others, her condition would not prevent her from progressing in school at an adequate pace." (Tr. 140).

    3.  Vicki Warren, Ph.D. - Reviewing

On July 16, 2012, Vicki Warren, Ph.D., reviewed M.M.'s records on behalf of the state agency. (Tr. 147-48). Dr. Warren generally affirmed the assessment of Dr. Waggoner, finding no limitations in "acquiring and using information," "moving about and manipulation of objects," and "health and physical well-being." (Tr. 148). Dr. Warren further agreed with Dr. Waggoner that M.M. had less than marked limitations in "attending and completing tasks," "interacting and relating with others," and "caring for herself." (*Id.*).

<u>Teacher Reports</u>

Mrs. Bernstein, M.M.'s schoolteacher, sent a letter to Ms. McMichael on April 10, 2013, indicating she wanted to discuss M.M.'s behavior, remarking that she had not "come back to school 'with a new attitude.'" (Tr. 404). The letter indicated M.M. had been removed from class multiple times, and exhibited disruptive behavior, including not listening or following directions, tapping her feet, talking out, making screeching noises, and dancing down the hallway. (*Id.*). Further, Mrs. Bernstein stated M.M. spit on other students, and went up to another student and shook her. (*Id.*). The letter requested that Ms. McMichael have a discussion with M.M. about proper behavior at school. (*Id.*).

In August through October of 2013, Daily Progress Reports submitted by M.M.'s teachers and therapists showed good days, but indicated M.M. continually showed some inappropriate behavior, including making weird noises, yelling out, struggling to stay on task and

to follow directions, and being distracting, although she was generally able to complete her work.  (Tr. 398-403).  Some reports showed unsatisfactory days with increased undesirable behaviors, including constantly yelling and turning around in her seat.  (Tr. 388-89).  However, in November and December of 2013, these reports show continuing (although at times intermittent) problems with following directions, staying on task and working quietly, keeping hands and feet to herself, and respecting peers and adults at school.  (Tr. 407-10).  These reports show M.M. has both "good days" and "bad days," and noted behaviors including requiring redirection, constantly arguing with peers, yelling out, and slamming books on the floor.  (Tr. 408-09).  Further, a written note from her teacher, Ms. Carr, informed that M.M. had shown poor behavior for two days in December, was constantly out of her seat and talking out, continuously argued with classmates, and inappropriately threw papers into the garbage.  (Tr. 407).

Mother

M.M.'s mother completed a function report on August 23, 2011.  (Tr. 227-34).  Ms. McMichael reported that M.M.'s ability to communicate was limited with respect to taking part in conversations with other children.  (Tr. 230).  Further, she reported M.M.'s impairment affected her behavior with others in that she did not enjoy being with other children of her same age, did not share toys, take turns, or play "pretend" or other games, although she was able to show affection toward her parents and toward other children.  (Tr. 232).  Ms. McMichael's report showed that, while M.M. was able to take care of some of her own personal needs, she had limitations in her abilities to dress herself without help, bathe herself, or put her toys away, and could maintain attention to TV, music, reading aloud or games for "[u]sually less than 15 minutes."  (Tr. 233).

Ms. McMichael filled out a questionnaire at the request of the agency on August 31, 2011.  (Tr. 245-49).  She noted several times that M.M. does not listen, and that she has tantrums and fights, including at school, and does not do her school work or help with household chores.  (Tr. 246).  According to the questionnaire answers, M.M. responds to simple instructions in an aggressive manner, such as throwing toys when asked to put them away, playing in the water when instructed to wash her hands, and generally does not perform requests unless she wants to.  (*Id.*).  Relating to social interaction, Ms. McMichael's answers were similar to the assessments of Ms. Scheifer, indicating M.M. did not have friends, did not get along with her classmates, fights a lot, and does not listen to adults.  (Tr. 247).  Further, Ms. McMichael stated M.M. "wants everything her way," runs and jumps around, including running out of class, does not pay attention in school, and quickly loses interest during activities.  (Tr. 247-49).

## SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on March 24, 2006.  Therefore, she was a preschooler on August 16, 2011, the date the application was filed, and is currently a school-age child.

2. The claimant has not engaged in substantial gainful activity since August 16, 2011, the application date.

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since August 16, 2011, the date the application was filed.

(Tr. 70-81) (internal citations omitted).

### III.     STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings.  The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings.  These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(c)(2).  When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions.  *Id.*  The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record.  20 C.F.R. § 416.927(e)(2)(i-ii).  Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's

teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age.  20 C.F.R. § 416.926a(b)(3)(i-ii).

## IV.    STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute should be decided differently, or if substantial evidence also supports the opposite conclusion.  The Commissioner's decision, if supported by substantial evidence, must stand.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.    ANALYSIS

17

Plaintiff argues the ALJ did not properly evaluate the evidence, and his reliance on the opinions of the state agency psychological consultants, who did not review the entire record, was in error.  Therefore, Plaintiff argues the decision is not supported by substantial evidence.  For the foregoing reasons, the undersigned agrees.

Generally, an ALJ may afford the opinions of state agency consultants, even non-examining reviewers, significant weight, because they are considered "highly qualified" and are "experts in Social Security disability evaluation."  20 C.F.R. 416.927(e)(2)(i).  In reaching his conclusions, the ALJ gave great weight to the opinion of Dr. Koricke, finding her opinion was well supported by her own findings and the record as a whole, as well as to the opinions of state agency reviewing consultants Drs. Waggoner and Warren.  (Tr. 73, 81).  Along with her assessment of specific limitations under the relevant functional domains, upon examination on February 27, 2012, Dr. Koricke assigned M.M. a GAF score of 55, "implying moderate symptoms and moderate impairment in daily functioning."  (Tr. 342, 346-47).  Subsequently, Dr. Waggoner reviewed the record, including the report of Dr. Koricke, on March 5, 2012 and determined M.M. did not meet a listed impairment, had no marked impairments, and that the limitations she did have in completing tasks and relating to others would not prevent her from progressing in school at an adequate pace.  (Tr. 137-40).  Dr. Warren again reviewed the record on July 16, 2012, and generally affirmed the findings of Dr. Waggoner.  (Tr. 147-48).

Plaintiff argues it was not proper for the ALJ to rely on these opinions as the basis of his decision because they formulated their conclusions without reviewing the complete record.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (State agency medical consultants may be entitled to greater weight when the "consultant's opinion is based on a review of a complete case record that…provides more detailed and comprehensive information

than what was available to the individual's treating source."). In her brief, Plaintiff points to a great deal of evidence, including school reports and treatment records showing the continuing and arguably worsening nature of M.M.'s problem behaviors *after* the reviews by the state agency consultants. Specifically, Plaintiff noted that these reviewers did not consider: (1) a teacher's note dated April 10, 2013, which indicated M.M.'s attitude had not changed, and gave multiple examples of defiant, disruptive, inappropriate, and aggressive behaviors; (2) the ISP team's referral of M.M. in 2013 to a partial hospitalization program to provide a more restrictive environment to help with her difficult behaviors and growing needs; (3) the decision to start her on medication to manage her behavior, or subsequent increase in medication dosage; (4) the decline in her GAF scores, to 51 on April 19, 2013, and then to 45 on July 9, 2013 (indicating at that time serious symptoms and impairments in functioning); (5) the expansion of M.M.'s ISP from two to four treatment goals between 2011 and 2013, and a lack of attaining any of these goals; or (6) the testimony of M.M.'s mother that she continued to have behavior problems and the ineffectiveness of the medication, despite an increase in dosage.  (Tr. 97, 364-65, 367-69, 381-82, 385, 404).   The Court agrees that this evidence is relevant and required proper consideration.  *See Orick v. Astrue*, No. 1:10-cv-871, 2012 WL 511324, *5 (S.D. Ohio Feb. 15, 2012) (an ALJ must discuss relevant evidence and "articulate with specificity reasons for the findings and conclusions that he or she makes.") (*quoting Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428, *4 (6th Cir. 1999)); *see Morris v. Sec'y of Health & Human Servs.*, 845 F.2d 326 (6th Cir. 1988).

The opinions of state agency reviewers who did not review the entire record are not automatically invalidated where the ALJ considered them in conjunction with the omitted evidence.  In *McGrew v. Comm'r of Social Security*, 343 F. App'x 26, 32 (6th Cir. 2009), a

claimant argued the ALJ improperly relied on the opinions of reviewing physicians because they were out of date and did not account for changes in the claimant's condition.  However, the court rejected this argument, finding the ALJ's reliance on the opinions was proper because he also considered subsequent examinations and relevant changes in the claimant's condition in making his overall determination.  *Id.*  Conversely, in *Blakely*, the court determined the ALJ's reliance on the state agency consultants opinion was erroneous because the consultants did not have an opportunity to review subsequent treatment records reflecting ongoing treatment, and the ALJ did not indicate he considered that evidence before adopting the findings of the non-examining consultants.  *Blakely*, 581 F.3d at 409.  Accordingly, an ALJ's decision must convey that he appropriately considered any additional evidence when relying on an opinion based on an incomplete record.

Here, the ALJ's analysis does not adequately supplement the opinions of the state agency consultants that did not have access to records after their assessments, as the entire decision is riddled with material errors and mischaracterizations that undermine his conclusions.  Thus, a reasonable mind could not accept his analysis as substantial evidence in support of his conclusions that the record shows improvement in M.M.'s behavior, and that she exhibited no more than moderate limitations during the relevant period.  *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (A "court cannot uphold an ALJ's decision…where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see generally Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) ("[T]he Commissioner's findings [must be] supported by substantial evidence" which is defined as "relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.").  For instance, the ALJ determined that treatment records showed

"that with medication the claimant's behavior and symptoms improved." (Tr. 73). In support, he pointed to the July 9, 2013 treatment notes of Dr. Nehrer, specifically that Dr. Nehrer described claimant as "pleasant" and recorded that her mother stated she was "doing well" with Adderall. (Tr. 73, 369). However, review of the treatment notes show that M.M. was actually first prescribed a trial of 5mg Adderall at that appointment, and thus had not yet started the medication, and that her mother's comment was in reference to M.M.'s 13-year-old *sibling*, who was the person described as "doing well on 10 mg of Adderall." (*Id.*).

Another significant error is the ALJ's misinterpretation of the April 19, 2013 Mental Health Assessment Annual Update, finding that it showed M.M. "was *now* responding better to directives from adults" and having fewer aggressive episodes with peers. (Tr. 73) (emphasis added). This statement indicates the ALJ found this improved behavior was current to the date of the report, when in fact it had occurred temporarily and at a time prior to the April 19, 2013 review. (Tr. 73, 381-83). The assessment actually made clear that the improvement was not current, that M.M. had regressed during the course of the year, and that, at the time of the assessment, she continued to display undesirable behaviors including arguing with peers and teachers, actively defying teachers' requests, and fighting and making threatening statements. (Tr. 381-82). Further, contrary to the ALJ's interpretation that the report showed improved behavior, the assessment identified M.M. as having *increasing* needs that required a more restrictive environment. (Tr. 381).

Further, much of the ALJ's analysis of the evidence that followed the review of the state agency consultants inappropriately glosses over, or omits entirely, evidence that does not support his conclusions. It is well established that an ALJ is under no obligation to mention every piece of evidence presented to him to show that such evidence was considered. *Kornecky v. Comm'r*

*of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (per curium) (*quoting Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  However, "the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 881 (*citing Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x 140, 148 (3d Cir. 2010) (*quoting Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)* ("The ALJ has an obligation to 'consider all evidence before him'…and must also 'mention or refute…contradictory, objective medical evidence' presented to him.")).  Although it is up to the ALJ to weight the evidence, he cannot merely disregard evidence that is contrary to his view.  *Id*.  Rather, the ALJ must explain the evidence considered in a way that allows a subsequent reviewer to know why evidence was valued or rejected.  *Id.*

For instance, the ALJ fails to adequately discuss the treatment records provided by Dr. Nehrer.  In his decision, the ALJ points to these records to show that her symptoms improved with medication, and that she could interact with others "when so inclined," despite sleep issues presumably caused by a lack of routine and television before bed.  (Tr. 73, 78, 80).  In support, the ALJ points to Dr. Nehrer's treatment records dated July 9, 2013, noting she was currently taking Adderall and her mom stated she was "doing well" with Adderall.  (Tr. 73, 369). However, as stated above, review of the treatment notes show that this was a clear error, as M.M. was not taking Adderall until after that appointment, and thus could not support the conclusion that she was improving once on medication.  *Id.*  The ALJ also refers to treatment notes dated September 3, 2013, pointing out M.M.'s father reported worsening symptoms; however, he does not resolve this inconsistency with his previous statement that treatment records showed she was

improving, but does note that they discussed her ongoing sleep issues, and that her medication was increased at that time.  (Tr. 73, 364-65).

While the ALJ does not ignore the treatment records of Dr. Nehrer completely, he does leave out relevant evidence that could undermine the conclusion that M.M. was improving on medication, and that she exhibited no more than moderate symptoms. "When an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Orick*, 2012 WL 511324 at *5 (*quoting Morris*, 1988 WL 34109 at *2).   The ALJ failed to acknowledge that, after starting her on medication in July of 2013 due to continuing behavior problems, Dr. Nehrer increased the dosage of her medication on September 3, 2013, indicating her problematic behaviors continued despite medication. (Tr. 277, 364-65, 367).  Further, while the ALJ contends the treatment notes show claimant's behavior was improving, he failed to acknowledge that Dr. Nehrer indicated claimant's progress after two months on medication as "No Change."  (Tr. 366).  Further, while claimant had previously received GAF scores indicative of moderate limitations or difficulties, Dr. Nehrer's July 2013 notes indicated worsening, serious symptoms, as he decreased her GAF score to 45, with problems with primary support and education.  (Tr. 369).  Because this evidence could undermine the determination that M.M. had only moderate symptoms and that she was improving, the ALJ's failure to address this evidence in his analysis was a significant error.

The ALJ's analysis of the April 19, 2013 assessment is problematic in this respect as well.  While this Court recognizes that the ALJ acknowledged that this report showed some continuing "behavior and attention issues…despite previous progress," it is not clear that he considered the extensive evidence of continuing and worsening behavior problems, except for

his mentioning that she had begun to "'deliberately' misbehave."  (Tr. 73).  *See Orick*, 2012 WL 511324 at *5; *see Fleischer*, 774 F. Supp. 2d at 881.  Absent from the decision is any discussion of the statements in the assessment that casts doubt as to the validity of the ALJ's conclusion that M.M. was improving, specifically:  that M.M. continued to display the problem behaviors; that her behaviors had escalated at home and at school; that she was referred for partial-hospitalization services "to address her *growing needs in a more restrictive environment*"; that she was reported as having low academic success; and that her GAF score had decreased by 4 points to 51, just one point above the "serious" impairments bracket.  (Tr. 381-83) (emphasis added).

The ALJ's reference to teachers' reports in support of his finding that the record showed M.M. exhibited improvement after medication is also inadequate.  Following the implementation of a medication regimen, the record includes behavior and progress reports from M.M.'s teachers from August through December of 2013.  (Tr. 388-403, 407-10).  Despite his recognition that she continued to have good *and* bad days, the ALJ pointed to only two specific reports, and explained on December 2, 2013, the teacher note "indicate[d] the claimant was very tired and had her head down for a majority of the group," and the next day she responded to redirection and had a good day.  (Tr. 73-74).  The ALJ failed to acknowledge the specific behaviors that continued throughout this time period, beyond the generalized statement that she had good and bad days, and occasionally referencing her response to redirection and completion of school work as shown by her ISP assessment prior to these teacher reports. (Tr. 70, 73-78)  These reports showed continuing disruptive, argumentative, and aggressive behaviors, although also indicated she was sometimes able to complete work, and had "good" days interspersed with "poor," "unsatisfactory," and "not good" days, but showed no consistent trend of improvement.

(Tr. 388-403, 407-10).  His sparse analysis of this significant part of the record does not clearly convey whether he discredited the reports of her continuing dysfunctional behavior (and if so, for what reason), or whether this evidence was improperly ignored.  *See Orick*, 2012 WL 511324 at *5; *see Fleischer*, 774 F. Supp. 2d at 881.

This Court finds these deficiencies in the ALJ's analysis were not limited only to the evidence that was unavailable to the state agency reviewers, but rather permeate throughout the entire decision, further eroding the supportability of his final determination.  *See generally Fleischer*, 774 F. Supp. 2d at 877; *see generally Craig*, 212 F.3d at 435-36.  For instance, the ALJ stated the record showed improvement, including doing well in school, getting passing grades, and getting along with family, in her December 1, 2011 ISP.  (Tr. 72, 289-92).  However, review of the record shows that the ALJ was erroneously considering the ISP documents of M.M's twin brother, and had no relevance whatsoever to M.M.'s behavior.[2]  (*Id.*)

The ALJ's analysis of the mental health assessment performed by Ms. Schleifer on July 10, 2011 omits a great deal of Ms. Scheifer's observations that could undermine the ALJ's finding that M.M.'s had no more than moderate limitations.  Finding her impairments were not as limiting as alleged, the ALJ referenced only one page of the fourteen page assessment, and noted only that Ms. Schleifer "found the claimant hyper-responsive to stimuli," check-marked her overall behavior, thought content, and affect and mood as "unremarkable," and that she found no evidence of depersonalization or increased speech rate.  (Tr. 72).  However, the ALJ made no reference to other significant findings, specifically:  (1) that Ms. Schleifer assessed that M.M. had decreased impulse control, a reduced ability to provide for her own needs or safety

---

[2] The undersigned also notes that, even if the document was related to M.M., the ALJ incorrectly stated that it showed the subject was "doing well in school."  Although the ISP indicated the subject attended school and was getting passing grades, it clearly stated the subject "is demonstrating poor school success," which is blatantly contradictory of the ALJ's assessment that the document shows the subject "was doing well in school."  (Tr. 72, 289, 292).

(including walking out of her home in an unsafe manner), and low school performance due to refusal to work for the teacher; (2) frequent rejection by peers due to aggressive behavior, and general struggles with peer interaction; and (3) her clinical summary that M.M. argues with peers and adults, did not follow rules, struggles to remain in designated areas, has tantrums, and exhibits excessive energy.  (Tr. 309-19).  As review of the evidence over the relevant time period indicates a continuation of these behaviors to varying degrees, the failure of the ALJ to acknowledge the original findings of Ms. Schleifer with more detail undermines the ALJ's overall conclusion that M.M.'s behavior improved with treatment, and that she exhibited no more than moderate impairments.

Further, the ALJ's analysis repeatedly indicated the record supported his conclusion that M.M. has control over her behavior, and that her continued behavior and attention issues following medication was due to "deliberate" misbehavior.  (Tr. 73-74, 78).   The ALJ thereby concluded she was able to appropriately interact with others "when so inclined."  (Tr. 73-74).  In support, the ALJ cited to Dr. Nehrer's report that claimant was "pleasant" at her appointment, that her ISP dated April 17, 2013 showed she "likes to be helpful to others" and has a good vocabulary, and further concluded such evidence was consistent with the opinions of the state agency reviewers, who found no more than moderate limitations in her functioning.  (Tr. 73, 78, 81).

However, regardless of the strength of this evidence in support of the ALJ's conclusion, he failed to acknowledge that the record contains numerous treatment notes and other documentation relating to M.M.'s impulsivity, which is not consistent with a finding that she has substantial control over her behavior. In his decision, the ALJ makes one reference to M.M.'s impulsivity, noting that her mother reported to Dr. Koricke that "claimant often acts impulsively

and can be oppositional and aggressive."  (Tr. 72, 345).  Beyond this, however, the record evidence included Dr. Koricke's assessment (which the ALJ expressly affords "great weight") recognizing M.M.'s impulsivity related to ADHD/ODD, which she referred to multiple times in her report. (Tr. 73, 345-47).  Further, as stated above, the ALJ ignored a great deal of relevant findings in the treatment notes and assessments of Ms. Schleifer, including her initial assessment noting excessive impulsive behavioral functioning and decreased impulse control, and subsequent treatment notes showing continued focus on treating her continuing impulsive behaviors.  (Tr. 309, 314, 320-23, 333, 350).  Additionally, M.M.'s original ISP, as well as subsequent updated versions, all included goals and comments relating to her continuing impulsive behavior, including a goal to "increase [her] ability to control her behavior."  (Tr. 328-29, 358, 360, 376).  Although the ALJ clearly reviewed these documents in his analysis, his failure to acknowledge the contradictory references to her ongoing lack of impulse control undermines his conclusion that M.M. had control over her behavior, and thus calls into question his overall finding of no more than moderate limitations.  *See generally Orick*, 2012 WL 511324 at *5; *see generally Fleischer*, 774 F. Supp. 2d at 881.

Additionally, the ALJ at times made generalized conclusions that do not necessarily follow from the evidence cited in support, calling further into question the legitimacy of his overall analysis.  *See Fleischer*, 774 F. Supp. 2d at 877; *see generally Bailey*, 173 F.3d 428 at *4 ("[A]n ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes.").  For instance, the ALJ cited directly to the record to support his conclusion that "school records indicate that with proper treatment the claimant's behavior improved."  However, the cited documents actually show ongoing treatment for her behaviors with no mention of improvement, as well as evidence supporting the opposite conclusion, such

as enrollment in the Partial Hospitalization Program and the addition of goals to her ISP.  (Tr. 252-59, 275-88).  The ALJ failed to show what specific evidence in these records would support his conclusions.  *See Bailey*, 173 F.3d 428 at *4.

The ALJ's decision is undermined by multiple assertions of unsupported conclusions such as this.  The ALJ cited treatment records dated July 10, 2011 that indicated M.M. "responded well to a positive reinforcement based program and is eager to please adults," from which he concluded that her defiant behavior would increase in response to negative reinforcement, and improve with positive reinforcement.  (Tr. 72).  Regardless of the veracity of this statement, the ALJ appeared to make a conclusory jump without the support of actual treatment notes or professional opinions, as the referenced evidence made only a general assessment that she responds well to positive reinforcement, and discussed neither her defiance specifically, nor her response to negative reinforcement.  (Tr. 72, 319).  Further, the ALJ found significant that "the record indicates the claimant's condition improved despite the fact at this time she was not taking medication," but bases this premise on: (1) only one report following her original assessment (dated less than three weeks later, with a one-sentence comment in support of the check-box determination that M.M. showed improvement); (2) his erroneous review of M.M.'s brother's ISP dated December 1, 2011; and (3) records showing she was not taking medication at that time, including a letter from Ms. Schleifer that does not suggest any improvement as of August 12, 2011, and further stated Ms. Shleifer's opinion that medication is needed for further behavioral intervention.  (Tr. 72, 333).

The errors in the ALJ's analysis are prejudicial to the claimant and require remand for further evaluation. "Even where the ALJ's decision is based on mistakes, [a court will] affirm[] those conclusions if the mistakes constituted harmless error." *Keeton v. Comm'r of Soc. Sec.*, 583 Fed. App'x 515, 524 (6th Cir. 2014).  However, an error is not considered harmless where "there is a reason to

believe that remand might lead to a different result." *See Bollenbacher v. Comm'r of Soc. Sec.*, 621 F. Supp. 2d 497, 502 (N.D. Ohio 2008) (*citing Kornecky*, 167 F. App'x at 507). Here, the ALJ puts significant reliance on his flawed evaluation of the evidence, used in his functional domain analysis and in support of his overall findings of no more than moderate limitations and improving behavior.  As discussed above, he omits or mischaracterizes a great deal of evidence that, if properly analyzed, could reasonably show more serious restrictions and worsening behavior.  As the ALJ did not accurately consider this evidence, or resolve any inconsistencies with evidence he chose to discredit, remand is required.  *Orick*, 2012 WL 511324 at *5.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be VACATED, and the case be REMANDED back to the Social Security Administration.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  May 20, 2016

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).